# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| V. | ) | Criminal No. 07-00371 |
| | ) | Judge Nora Barry Fischer |
| TIWAND HILL, | ) | |
| Defendant. | ) | |

## OPINION and ORDER

This matter is before the Court on a Motion to Suppress Physical Evidence and Statements [27] ("Defendant's Motion"), filed by Defendant Tiwand Hill on January 16, 2008. On March 19, 2008, the Court held a suppression hearing, at which it heard testimony from Special Agent Jeffrey Haggerty of the Alcohol, Tobacco, & Firearms Bureau and heard subsequent argument from the counsel for the parties. For the following reasons, said motion is denied.

## FACTS[1]

On or about August 17, 2007, a burglary occurred at Fazi Firearms, a federally licensed firearm dealer in the Borough of Plum, Pennsylvania, during which "person or persons unknown took a stolen car and drove it through the front of the store and removed approximately thirty handguns." (Transcript at 5:6-8). Of particular relevance here, one of the firearms included a Fabrique Nationale, commonly known by its initials "FN" and its 5.7 caliber ammunition. As a result, Special Agent Haggerty requested that local firearms dealers advise him of any "suspicious purchases of ammunition or magazines," and specifically the "somewhat rare 5.7 caliber ammunition." (Transcript at 6:4, 6).

On or about September 1, 2007, a representative of Anthony Arms, a licensed firearms dealer

---

[1]

The Court gleans the following facts from the credible testimony offered at the March 19, 2008 suppression hearing by Special Agent Haggerty. (*See* Transcript at 70:4-6) ("The Court would note that, in the Court's estimation, Agent Haggerty is a credible witness to this Court").

in West Mifflin, Pennsylvania, advised Pennsylvania State Police Trooper Patrick Nied that an individual whom Anthony Arms identified as Tiwand Hill purchased and promptly returned 5.7 caliber ammunition (the same ammunition from the Fazi Firearms burglary) and ultimately purchased .357 caliber ammunition and 9-millimeter ammunition. He also inquired about an "AB-10 pistol," a 9-millimeter pistol. (Transcript at 8:25). The representative of Anthony Arms advised State Trooper Nied that the Defendant drove "a maroon GMC Tahoe SUV" registered in the names of Tiwand Hill and Rhonda Battles, (Transcript at 8:13; 9:15-17), and that Mr. Hill behaved suspiciously insofar as "he parked his vehicle way down in the corner of the lot," (Transcript at 7:16-17).[2]

On the next day, September 2, 2007, State Trooper Nied conducted a criminal background check on Mr. Hill, from which he discovered the following: (1) that Mr. Hill had an "extensive arrest record," (Transcript at 10:1-3); (2) that Mr. Hill's driver's license was suspended, (Transcript at 10:5-6); (3) that an active Protection From Abuse Order ("PFA") existed against Mr. Hill filed by Ms. Battles; and (4) that Mr. Hill resided at 57 Craighead Street, Pittsburgh, Pennsylvania. State Trooper Nied relayed all this information to Special Agent Haggerty on the same day. (Transcript at 9:22-25).

On September 4, 2007, Special Agent Haggerty proceeded to 57 Craighead Street,[3] where

---

[2]

At the suppression hearing, counsel for the Defendant objected asserting hearsay as to the information relayed from State Trooper Nied to Special Agent Haggerty. The Government responded noting that the Federal Rules of Evidence do not apply in a suppression hearing. The Court overruled the Defendant's objection. *See* Fed.R.Evid. 1101.

[3]

According to Special Agent Haggerty, Mr. Hill's suspended driver's license, the PFA Order, and the registration of the maroon GMC Tahoe all indicated 57 Craighead Street as his residence. (*See* Transcript 10:13-18).

he observed a maroon GMC Tahoe "with the same license plate that had been provided through Trooper Nied from Anthony Arms" parked near the front of the residence. (Transcript at 10:20-21). Special Agent Haggerty returned to his office and confirmed through the Allegheny County Probation Office and the Pennsylvania Board of Parole and Pardons that Mr. Hill had been convicted of a felony in or around 2001 and that said conviction had not been set aside or pardoned. (Transcript at 10:25-11:11). Special Agent Haggerty received (by way of facsimile transmission) a receipt from Anthony Arms, detailing the purchases by the Defendant. (Transcript at 11:14-16).

At approximately 1:45 p.m. that day, Special Agent Haggerty initiated surveillance at 57 Craighead Street in an unmarked vehicle. (Transcript at 13:11-13). He noted that the maroon GMC Tahoe was no longer parked there. (Transcript at 13:14-15). At approximately 2:15 p.m., Special Agent Haggerty observed an individual whom he believed to be Hill return to the residence in a maroon GMC Tahoe and enter the residence at 57 Craighead Street.[4] (Transcript at 13:21-14:12). At approximately 3:30 p.m., Special Agent Haggerty and Detective Bart Hennessy[5] observed Hill exit the residence and walk toward their vehicle with his keys in his hand, at which time they approached him, identified themselves as law enforcement officers, and asked if they could speak with him, to which the Defendant agreed. (*See* Transcript at 16:24-17:1) ("Q: Okay. So, you basically approach him and ask to speak to him. What is his response? A: He was agreeable. He said that he would talk to us"). At that point, Detective Hennessy informed Hill that he would like

---

[4]

At the suppression hearing, Special Agent Haggerty confirmed that the person he observed enter the residence was the Defendant, Tiwand Hill. (*See* Transcript at 14:19-21).

[5]

Special Agent Haggerty called and asked Detective Hennessy to assist him, to which he agreed. (*See* Transcript at 15:6-9).

to pat him down for officer safety, and "Mr. Hill was agreeable to that." (Transcript at 17:2-4). Detective Hennessy patted down Hill, which revealed approximately $3,300 in cash, a cellular telephone, and keys. (Transcript at 17:2-11). Special Agent Haggerty advised the Defendant that he was not under arrest and that he was free to leave but that they wished to speak to him, to which the Defendant again agreed. (Transcript at 17:15-18). Upon Special Agent Haggerty's suggestion, they spoke in the officers' vehicle, with Special Agent Haggerty in the driver's seat, the Defendant in the front passenger seat, and Detective Hennessy in the back. (Transcript at 17:21-23). The Defendant asked the officers if they could drive to a more secluded location. (Transcript at 18:11-15). Conceding to his request, the officers drove about a block and a half away and again parked. (Transcript at 18:16-22).

Once they parked, Special Agent Haggerty asked Hill if he had been at Anthony Arms on the date in question. (Transcript at 19:2-5). While he initially said that he was not there, he subsequently stated that he had bought some ammunition at the request of "some associates." (Transcript at 19:6-9). The Defendant stated that while he gave some of the ammunition to said "associates," he retained the remainder in his maroon GMC Tahoe parked in front of his residence. (Transcript at 20:1-5). The law enforcement officers responded by asking if he would allow them to search his vehicle, and he agreed. (Transcript at 20:8-9). The officers then asked the Defendant to execute a "Consent to Search" form as to his vehicle, which the Defendant and the officers signed and dated. (Transcript at 20:16-18); (*see* Docket No. 34-3) ("Government Exhibit 1"). In order to provide assistance with the search, the officers contacted Detective Steckel,[6] Detective Hennessy's

---

[6]

In his testimony at the suppression hearing, Special Agent Haggerty did not indicate Detective Steckel's first name.

partner.  (Transcript at 23:7-14).  Special Agent Haggerty, Detective Hennessy, and the Defendant returned to the residence at 57 Craighead Street and parked directly behind the Defendant's vehicle. Detective Steckel met the officers and the Defendant at 57 Craighead Street.  Without any request by the law enforcement officers to unlock his vehicle, the Defendant did so with a remote control and Detective Steckel and Detective Hennessy proceeded to search the Defendant's vehicle. (Transcript at 24:4-14).  Special Agent Haggerty and the Defendant remained in the unmarked vehicle.  (Transcript at 24:15-17).

After the Detectives noted that there appeared to be no ammunition in the vehicle, the Defendant, on his own accord,[7] placed a telephone call on his cellular telephone, during which he asked the individual at the other end about the ammunition.   (Transcript at 24:23-25:13).  After ending the call, the Defendant informed Special Agent Haggerty that he called his girlfriend, Ms. Battles, who informed him that she had moved the ammunition into the house at 57 Craighead Street, specifically the bedroom.  (*See* Transcript at 25:22-24).  In response, Special Agent Haggerty asked, "so now what," to which the Defendant replied, "so let's go get it."  (Transcript at 25:19-20). Subsequently, the Defendant escorted all of the officers (Special Agent Haggerty, Detective Hennessy, and Detective Steckel) into the residence.   (Transcript at 25:24-25).  The Defendant unlocked the door, disabled the alarm, and informed the officers that the ammunition was in the closet in his bedroom.  (Transcript at 25:25-26:6).  Special Agent Haggerty informed the Defendant that they wanted him to point out where the ammunition was located but not to reach for the same, to which the Defendant indicated that he understood.   (Transcript at 26:18-24).  Special Agent

---

[7]

(*See* Transcript at 25:11-13) ("Q: So, you had not requested that he do that [i.e., place a telephone call and inquire about the ammunition], correct?  A: No.  And, in fact, I was kind of surprised when I looked over and he was on his cellphone").

Haggerty, Detective Steckel and the Defendant proceeded to the to the second floor while Detective Hennessy remained on the first floor for officer safety. (Transcript at 27:5-7). According to Special Agent Haggerty, the Defendant raised no objection to Detective Hennessy remaining on the first floor. (*See* Transcript at 27:12-16).

The Defendant showed Special Agent Haggerty and Detective Steckel to a bedroom and directed the officers to a bag on the top shelf of the smaller closet, which Special Agent Haggerty retrieved and discovered contained a box of 9-millimeter ammunition. (Transcript at 28:5-13). However, Special Agent Haggerty informed the Defendant that he did not see the .357 caliber ammunition, which seemingly prompted the Defendant to walk towards Special Agent Haggerty and sit down on the bed directly behind him. (Transcript at 28:13-29:1). Now sitting on the bed, the Defendant reached towards the floor underneath the bed only to be reprimanded by Special Agent Haggerty not to reach for anything, as he previously instructed the Defendant. (Transcript at 29:12-18). The Defendant explained that he thought the remaining ammunition was under the bed. (Transcript at 29:18-19). Special Agent Haggerty looked under the bed and saw another bag. (Transcript at 29:20-21).

Special Agent Haggerty asked the Defendant if there were any guns in the room, but he did not answer. (Transcript at 29:25-30:1). Detective Steckel then asked the Defendant again if there were any firearms under the bed, to which the Defendant responded in the affirmative. (Transcript at 30:1-5). Detective Steckel then removed his taser and pointed it at the Defendant and the officers summoned Detective Hennessy to the second floor. (Transcript at 30:8-14). The officers removed the Defendant from the bed and asked him to sit on a chair in the middle of the room, yet still within reach ("with a lunge") of where the firearms were allegedly located, approximately five to seven

feet. (Transcript at 30:25-31:3). Detective Hennessy lifted the bed and the officers retrieved two firearms: a five-shot Smith & Wesson revolver and a Jimenez Arms 9-millimeter pistol, both of which were fully-loaded.[8] (Transcript at 31:14-15). After the officers seized the weapons, Detective Hennessy advised the officers and the Defendant that he saw several scales and other evidence of marijuana (including baggies as well as marijuana residue) in plain view on the dining room table on the first floor. (Transcript at 32:8-11). The Defendant informed the officers that there were not any drugs in the house but that "he was on his way to go purchase three pounds of marijuana." (Transcript at 32:23-25).

At this point, Special Agent Haggerty noticed that the Defendant "kept looking in the larger closet" and the officers and Defendant "discussed it openly" that the Defendant continued to do so. (Transcript at 33:6-10). Special Agent Haggerty opined that "it look[ed] as though maybe there is marijuana in the closet," to which the Defendant disagreed and stated that the officers could look. Detective Steckel then asked the Defendant for his written consent to search the remainder of the residence, to which he once again agreed, executing another consent to search form. (Transcript at 33:6-16); (*see* Docket No. 34-4) ("Government Exhibit 2").[9] As a result of the ensuing search of the residence, the officers seized numerous items, including a Pennsylvania identification card, $1,400 in cash, a digital scale, a black plastic bag containing a small amount of marijuana, a box of

---

[8]

The Smith & Wesson revolver carried the .357 caliber ammunition and the 9-millimeter pistol carried the 9-millimeter ammunition. (Transcript at 31:19-24).

[9]

This consent to search form was entitled "Allegheny County District Attorney Violent Crimes and Firearms Task Force Voluntary Consent to Search."

trash bags, a black nylon bag with plastic baggies, and a cellular telephone.[10]

## PROCEDURAL HISTORY

On October 16, 2007, the Government filed an Indictment charging Defendant Tiwand Hill with one count of Possession of a Firearm by a Convicted Felon, on or about October 17, 2006, in violation of 18 U.S.C. § 922(g). After two extensions of time to file pre-trial motions, on January 16, 2008, Defendant Hill filed the instant motion to suppress. On February 19, 2008, the Government filed Government's Response to Motion to Suppress Evidence Filed by Tiwand Hill (Docket No. 33) ("Government's Response"). On March 19, 2008, the Court held a suppression hearing, at which Special Agent Haggerty testified on behalf of the Government and counsel provided argument. Thereafter, on April 10, 2008, the Government filed Government's Supplemental Response to Motion to Suppress Evidence Filed by Defendant Tiwand Hill. (Docket No. 36) ("Government's Post-Hearing Memorandum"). Finally, on May 7, 2008, the Defendant filed Defendant's Memorandum in Support of Motion to Suppress Physical Evidence and Statements ("Defendant's Post-Hearing Memorandum"). (Docket No. 43).

## ARGUMENTS PRESENTED

In his motion, Defendant argues that the initial search of the vehicle as well as the subsequent search of the residence violated his constitutional rights insofar as (1) the officers had no probable cause or reasonable suspicion to approach the Defendant and to conduct a search or an investigatory detention of him based on the information and short period of surveillance; (2) any consent to search Defendant's vehicle was obtained as a direct result of the initial illegal detention and search and not

---

[10]

The "Evidence Control Log" details the items seized from the Defendant's residence that day. (*See* Docket No. 34-5).

obtained voluntarily and intelligently; (3) the search of the vehicle and later of the residence were both warrantless and without probable cause or valid consent; and (4) any statement obtained from Defendant violated his constitutional rights and was without a valid waiver. (*See* Defendant's Motion at ¶11). However, in his post-hearing memorandum, Defendant narrowed the issues to the following: (1) "did the officers have reasonable suspicion to approach the Defendant and was he initially and lawfully detained outside the residence and the vehicle?"; and (2) "was the consent given to search inside the bedroom a valid consent to search given that it followed the discovery of the weapons?" (Defendant's Post-Hearing Memorandum at 3).[11]

## ANALYSIS

Before addressing the substance of the parties' argument, the Court notes that it is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted).

A.     *Initial encounter and Terry stop*

Defendant argues that the officers lacked probable cause and/or reasonable suspicion to approach the Defendant and to conduct an investigatory detention. (Defendant's Motion at 3; Defendant's Post-Hearing Memorandum at 3). In response, the Government responds that the initial approach and pat down of the Defendant outside his residence was (1) consensual in nature and (2)

---

[11]

While the Defendant seemingly appears to concentrate in his post-hearing memorandum only on the initial detention and the search for weapons under the bed hence, abandoning his challenge to the officers' search of the vehicle and his statements under *Miranda*, the Court will nevertheless address the same.

nevertheless, the officers possessed reasonable suspicion to stop and frisk under *Terry v. Ohio*. (Government's Response at 7-10; Government's Post Hearing Memorandum at 9-12). The Court will address each proffered justification for the purported *Terry* stop and frisk, in turn.

As a threshold point, a police officer may approach a person on the street in order to ask him or her questions in the absence of reasonable suspicion or probable cause of criminal activity if the officer does not detain the person. *See Florida v. Royer*, 460 U.S. 491, 497-498 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"). "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Royer*, 460 U.S. at 497-98 (citations omitted). Such an encounter does not "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (providing that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). Hence, the officers' mere approach of the Defendant and request to ask him questions, to which he voluntarily consented, did not trigger Fourth Amendment protection. However here, after the officers approached the Defendant and after he voluntarily agreed to answer their questions, Detective Hennessy then frisked (or, patted down) the Defendant for officer safety. While the Defendant asserts that the officers lacked reasonable suspicion to conduct a *Terry* frisk outside his residence, the Defendant overlooks the fact and fails to rebut (or even address) Special Agent Haggerty's testimony that the Defendant agreed to the pat down search. (*See* Transcript at 17:2-4) ("At that time, Detective Hennessy informed Mr. Hill that he would like

to pat him down for officer safety. Mr. Hill was agreeable to that. Detective Hennessy then patted him down"). Hence, in light of Special Agent Haggerty's credible testimony, the frisk of the Defendant outside his residence constituted a consent search rather than a *Terry* frisk, and, as such, no reasonable suspicion was required. *See United States v. Drayton*, 536 U.S. 194, 207 (2002) ("The fact that the officers may have had reasonable suspicion does not prevent them from relying on a citizen's consent to search"). Accordingly, the Court finds that the officers' approach, stop, and pat down of the Defendant outside his residence was not a *Terry* stop and frisk but rather was a consensual citizen encounter.[12]

B.  *Search of Defendant's vehicle and home*

Next, the Defendant argues that the search of his vehicle as well as his residence violated the Fourth Amendment in that the officers lacked a warrant as well as probable cause or valid consent. (Defendant's Motion at ¶11.C; Defendant's Post-Hearing Memorandum at 3-4). The Government responds asserting that Defendant consented to a search of his vehicle as well as the officers' entry and search of his residence and thus, there was no seizure for purposes of the Fourth Amendment. Because the Government seeks to justify the respective searches by way of consent, the Court will

---

[12]

Despite the clear consensual nature of the encounter, because both parties raise the issue of whether reasonable suspicion existed, the Court will nevertheless address the same here. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court concluded that the police may stop and briefly detain a person for investigative purposes if the police possess "reasonable suspicion" supported by "articulable facts" that criminal activity may be afoot. *Id.* at 20-22.

Considering the specific information from State Trooper Nied regarding the alleged purchase of ammunition by the Defendant at Anthony Arms coupled with the information gathered by Special Agent Haggerty regarding Defendant's criminal background, the Court finds that the officers possessed "reasonable suspicion" to believe that Defendant may have committed (or been committing) a crime and may be armed and dangerous. Hence, the officers' investigatory detention (the stop *and* frisk) of the Defendant in front of his home on the afternoon of September 4, 2007 was justified and within the bounds of *Terry*.

consider Defendant's arguments through this lens.

A valid consent to search obviates the need to obtain a warrant or to demonstrate probable cause by operating as a waiver of the protections of the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable ... subject only to a few specifically established and well-delineated exceptions. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent") (internal quotations and citations omitted). In *Bustamonte*, the Supreme Court refined the consent and waiver exception to the warrant requirement of the Fourth Amendment by removing the knowledge or intelligent requirement of a voluntary waiver.[13] *Id.* at 235; *see also United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) ("Consent must be voluntary, may be express or implied, and need not be knowing or intelligent") (citing *Bustamonte*, 412 U.S. at 235). Instead, the test established under *Bustamonte* addressed only the voluntariness of consent under the "totality of the circumstances" and knowledge of the right to refuse to consent is only one factor in considering voluntariness: "In short, neither this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search." *Bustamonte*, 412 U.S. at 234; *see Lockett*, 406 F.3d 207, 211 (providing that consent "may be given unintentionally and without knowledge of the right to refuse consent, and the police are not required to warn an individual of the right to refuse consent"). Relevant factors include age and maturity, education

---

[13]

Prior to *Bustamonte*, courts applied the same test for waiver of Fourth Amendment rights as other constitutional rights (such as right to counsel), i.e., "intentional relinquishment of a known right or privilege." *See Johnson v. Zerbst*, 304 U.S. 458 (1938).

level, intelligence, ignorance of one's constitutional rights and the nature and duration of questioning and pressure. *U.S. v. Cole*, No. 06-1904, 2007 WL 2461776, at *5 (3d Cir. Aug. 31, 2007). The Government bears the burden of demonstrating that consent to search was given by a preponderance of the evidence. *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)); *see also United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

With the law in mind, the Court will now turn to the search of Defendant's vehicle and his residence.

First, as to the vehicle, the Court finds that Defendant voluntarily consented to the search of his vehicle. While parked at the secluded location about a block and a half from his residence, the Defendant informed the officers that he retained some of the ammunition that he purchased in his vehicle parked in front of his residence. (Transcript at 20:1-5). In response, the officers asked the Defendant if "he would allow [them] to search his vehicle to recover those items" and "[h]e indicated that he would." (Transcript at 20:8-9). Before proceeding back to the residence, the officers asked the Defendant to execute a "Consent to Search Form," which he did. (*See* Docket No. 34-3) ("Government Exhibit 1"). In fact, Special Agent Haggerty testified that he read the form to the Defendant and asked him to initial the top portion of the form regarding consent as well as the portion written by Special Agent Haggerty regarding the subject premises to which he consented, i.e., Defendant's vehicle. (Transcript at 21:13-20). It is well-established that an executed consent to search form reflects upon the voluntariness of a suspect's consent. *See United States v. Carney*, Criminal No. 06-350, 2007 WL 1864633, at *15 (W.D. Pa. June 27, 2007) ("The [waiver of rights form and consent to search form] executed by defendant indicate that he voluntarily waived his

*Miranda* rights and that he voluntarily consented" to the search); *United States v. Giampa*, 904 F.Supp. 235, 276 (D.N.J. 1995) ("The initialing of the *Miranda* waiver form by [the suspect] and his signing of the consent to search form were *inconsistent* with a finding that his will was overborne") (emphasis added). In addition to his express and unequivocal consent to search his vehicle, Defendant's conduct demonstrated an inference of consent in that, when they returned to the residence and parked, the Defendant unlocked the doors to his vehicle with a remote control without any request to do so from the officers. *See United States v. Almand*, 565 F.2d 927, 930 (5th Cir. 1978) (finding voluntary consent in fact where suspect "reached into his pocket, removed the key, and unlocked and opened the camper door"). Accordingly, considering his verbal consent to search, his actions specifically unlocking the door to his vehicle without any request from the officers to do so, the lack of any evidence of coercion, and the executed consent to search form, the Court finds that the Defendant voluntarily consented to the officers' search of his vehicle.

Second, as to the search of the residence, the Court again finds that the Defendant voluntarily consented to the search of the same.[14] Once the Detectives indicated that the search of the vehicle revealed no ammunition and without urging from Special Agent Haggerty, the Defendant placed a telephone call in order to locate the ammunition. After he ended the call, the Defendant volunteered the subject matter of the call: "He indicated that his girlfriend moved the ammunition into their house," (Transcript at 25:16-17), which prompted Special Agent Haggerty to ask, "[s]o now what," (Transcript at 25:19). Defendant responded, "so let's go get it." (Transcript at 25:19-20).

---

[14]

While Defendant seemingly directs his argument (in his Post-Hearing Memorandum) towards the search in his bedroom, in particular the officers' search under the bed and discovery of the firearms, the Court nevertheless finds it pertinent (if not necessary) to first address whether the Defendant consented to the officers' entry to his residence in the first place.

Subsequently, the Defendant led the three officers into his home, unlocked the door, disabled the alarm, and showed two of the officers upstairs into a bedroom. Akin to the search of the vehicle, Defendant has offered no evidence (or even argument) that the officers exerted any coercion towards the Defendant in relation to the entrance of his residence. While the Court recognizes the privacy and sanctity given to the home in the Fourth Amendment context, considering the oft-repeated adage that "[a] man's house is his castle,"[15] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 286 (1990) (quoting 2 Works of John Adams 524 (C. Adams ed. 1850)), "[t]he high expectation of privacy [in one's home], alone, will not destroy the otherwise consensual nature of the encounter," *United States v. Kim*, 27 F.3d 947, 953 (3d Cir. 1994) (citation and footnote omitted). Here, Defendant's collective conduct demonstrates that he voluntarily consented to the officers' entry into his residence and, as such, the officers' entry and presence into the home were reasonable as an exception to the warrant requirement.[16] *See Payton v. New York*, 445 U.S. 573 (1980); *see also Steagald v. United States*, 451 U.S. 204, 214 n.7 (1981) ("[A]bsent exigent circumstances *or* consent, an entry into a private dwelling to conduct a search or effectuate an arrest is unreasonable without a warrant") (emphasis added); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (quoting *Welsh*, 466 U.S. at 749 (1984)).

However, in his Post-Hearing Memorandum, Defendant appears to shift the focus of his argument to the subsequent search of the bedroom, in particular the officers' search underneath the bed and recovery of two firearms. Defendant argues that while he voluntarily retrieved the

---

[15]

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

[16]

ammunition for the officers, (*see* Defendant's Post-Hearing Memorandum at 3), he did not consent

to a search of the bedroom for firearms and hence, the officers' search for the same without consent,

a warrant, or exigent circumstances (or presumably, probable cause) violated the Fourth

Amendment, (*see* Defendant's Post-Hearing Memorandum at 3-4). Furthermore, Defendant asserts

that he only consented to a search of the residence after the officers recovered the firearms.

(Defendant's Post-Hearing Memorandum at 4). On the other hand, the Government asserts three

arguments: (1) given the totality of the circumstances, Defendant impliedly consented to the search

under the bed and seizure of the firearms; (2) the known presence of firearms created exigent

circumstances justifying the search under the bed and seizure of the firearms; and/or (3) given that

the officers were legitimately on the premises as well as Detective Hennessy's observation of

marijuana paraphernalia on the first floor in plain view, "even if the firearms had not been

discovered the detectives would have sought permission to search the residence" and the firearms

would have been inevitably discovered. (*See generally* Government's Post-hearing Memorandum

at 18-22).

"When an official search is properly authorized whether by consent or by the issuance of a

valid arrest warrant the scope of the search is limited by the terms of its authorization." *Walter v.

United States*, 447 U.S. 649, 656 (1980). In other words, the scope of the search is strictly limited

to the terms of the consent. "The standard for determining the scope of a suspect's consent under

the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable

person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*,

500 U.S. 248, 251 (1991) (citations omitted). In its determination as to the voluntariness of consent

from the totality of the circumstances, a court may consider verbal and non-verbal actions. *United*

*States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005) (citation omitted).

As an initial point, the Court notes that, in his Post-Hearing Memorandum, Defendant challenges the officers' search of the bedroom and the seizure of firearms but does not specifically challenge the officers' presence in the bedroom insofar as the Defendant admits that he voluntarily retrieved the ammunition for the officers. (*See* Defendant's Post-Hearing Memorandum at 3). In other words, the Court finds that the officers reasonably believed that Defendant's voluntary consent for them to enter his residence included the bedroom when, in fact, the Defendant led the officers' to the bedroom on the second floor. (*See* Transcript at 27:24) ("He took us to a bedroom that was on the second floor"). Moreover, while in the officers' vehicle outside the residence and before they entered the house, Defendant informed Special Agent Haggerty that the ammunition was in the bedroom. (*See* Transcript at 25:23-24). Hence, the Court finds that it was objectively reasonable for the officers to believe that the scope of the consent extended to the upstairs of the home, i.e., to the bedroom. Accordingly, the officers' presence in the bedroom was legitimate and justified by way of Defendant's voluntary consent. The question then becomes whether the Defendant's voluntary consent for the officers to enter his home and the bedroom extended to a search under the bed and search and seizure of the firearms?[17]

The Court finds that the Defendant by his words and actions voluntarily consented to the search under the bed. Relevant to the Court's analysis is *Florida v. Jimeno*, 500 U.S. 248 (1991),

---

[17] As the Court has previously noted, while Defendant appeared to challenge the seizure of the ammunition in his original Motion, Defendant's Post-Hearing Memorandum explicitly concedes the same. (*See* Post-Hearing Memorandum at 2) ("Defendant directed the officers directly to the ammunition as requested and the ammunition was retrieved"); (Post-Hearing Memorandum at 3) ("[Defendant] voluntarily retrieved that ammunition"). Thus, the Court declines to address this issue further.

in which the Supreme Court held that consent to search the interior of an automobile did not preclude the opening of a paper bag found inside the car. *Id.* at 1803. There, the Court rejected the respondent's argument that if the police wish to search closed containers within a car they must separately request permission to search each container: "[W]e see no basis for adding this sort of superstructure to the Fourth Amendment's basic test of objective reasonableness." *Id.* at 252. The Court added that "if [a suspect's] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.*

Applied in this context,[18] after retrieving the 9-millimeter ammunition from the bag in the closet, Special Agent Haggerty inquired about the .357 caliber ammunition. (Transcript at 28:13-14). This question prompted the Defendant to walk towards Special Agent Haggerty and sit down on the bed "in very close proximity to [Special Agent Haggerty]." (Transcript at 28:24-29:9). At this point, the Defendant reached "towards the bottom of the bed, or under the bed," which triggered a reprimand from the officers. (Transcript at 29:12-18). The Defendant then informed the officers that he thought the ammunition was "down on the floor." (Transcript at 29:18-19). Special Agent Haggerty looked and observed another bag. (Transcript at 29:18-19). In the Court's estimation, the Court finds that the scope of the general, original consent given by the Defendant included a search under the bed. The Court finds it significant that Defendant's initial consent to search concerned the recovery of the ammunition at issue. While the officers retrieved some of the ammunition from the closet, they had not yet recovered the .357 caliber ammunition. As the bag under the bed could

---

[18] The Court recognizes the factual distinctions between *Jimeno* (car) and the instant case (bedroom); nevertheless, from a general perspective, the Court finds that *Jimeno* is instructive as to the scope of consent.

have contained the remaining ammunition and considering the Defendant's movement towards the bed and verbal indication of the same, the Court finds that it was objectively reasonable for the officers to believe that the Defendant's consent to search for the ammunition included consent to search under the bed because "[t]he scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251 (citing *United v. Ross*, 456 U.S. 798 (1982)). Therefore, contrary to Defendant's argument, the officers did not need additional and separate consent to search under the bed as to the same ammunition for which the Defendant gave his original consent to search. *See Jimeno, supra*; *United States v. Mendez*, 431 F.3d 420, 426-27 (5th Cir. 2005) (upholding warrantless search of defendant's home where the actions of the officers "were within the scope of [the defendant's] original consent").

C.      *Search and seizure of firearms*

With respect to the search and seizure of the firearms recovered from under the bed, considering Defendant's conduct up to that point in which he demonstrated voluntary consent and even provided active assistance to the officers in recovering the ammunition[19] as well as his walking over to the bed, attempting to reach under the bed, and subsequently informing the officers that firearms were under the bed, the Court finds that it was objectively reasonable for the officers to believe that the Defendant had impliedly consented to the search and seizure of the same.[20]  *See*

---

[19]

When conducting a criminal background investigation of the Defendant on the morning of the day in question, Special Agent Haggerty contacted the Homicide Unit of the Allegheny County Police Department regarding pending criminal charges against Defendant, for which he was currently on bond. (Transcript at 12:12-18). The officer informed Special Agent Haggerty that the Defendant "had been very cooperative and talkative and essentially laid out the whole case to him when he was interviewed." (Transcript at 13:5-7).

[20]

While not raised by the Government, the Court opines that the "plain view" doctrine also

*United States v. Winston*, 444 F.3d 115, 121-22 (1st Cir. 2006) (finding that a suspect impliedly consented to a search of his nightstand when officers asked for identification and suspect told them it was in his nightstand and when the officers could not locate his nightstand, the suspect indicated with his shoulder); *United States v. Shipp*, 233 Fed. Appx. 847, 850, 2007 WL 1445744, at *1 (10th Cir. May 17, 2007) (not selected for publication) (finding that district court did not commit plain error where it held that defendant consented to search where he took the officers to where the firearms were located and "pointed to them"). Furthermore, at no time during the search of the bedroom did the Defendant object or seek to limit the scope of the search even after he voluntarily admitted that there were firearms under the bed. *See United States v. Kim*, 27 F.3d 947, 957 ("Of course [the defendant] could have limited his consent to certain items, but he had the burden to express that limitation, ..., which he did not do. [The Defendant] readily gave his general consent to the search, without hesitation or limitation") (internal citation omitted); *United States v. Alcantar*, 271 F.3d 731, 738 (8th Cir. 2001) (noting that "[a]t no time during the search did either Defendant object to the length of the search" and reaffirming the principle that "failing to object to the continuation of a consent search makes the continued search 'objectively reasonable' ") (citation omitted). In addition, the Court finds no evidence of coercion or pressure to consent exerted upon

---

justifies the officers' seizure of the firearms insofar as the officers were lawfully in a position from which they viewed the firearms (i.e., Defendant consented to search under the bed), the incriminating nature of the firearms were certainly immediately apparent, and the officers possessed a lawful right of access to the firearms. *See Minnesota v. Dickerson*, 508 U.S. 366, 374-75 (1993); *Washington v. Chrisman*, 455 U.S. 1, 9-10 (1982) (providing that seizure of incriminating items pursuant to a consensual search does not violate the Fourth Amendment). *See generally United States v. Wadley*, Criminal No. 07-166, 2007 WL 4593508, at *7-8 (W.D. Pa. Dec. 28, 2007).

the Defendant and the Defendant has not alleged as much.[21]  Accordingly, the Court finds that the

Defendant by his words and actions voluntarily consented to the search and seizure of the firearms

under the bed.  Nevertheless, despite Defendant's consent, (1) considering the presence of

ammunition in the room coupled with Defendant's criminal history (of which Special Agent

Haggerty was aware), Defendant's attempt to reach under the bed, Defendant's admitting to the

officers that firearms were under the bed, and Defendant's unusual movement and nervous

demeanor,[22] and Defendant's close proximity to both the officers and the location of the firearms,[23]

exigent circumstances existed in the form of danger to the lives of the officers justifying the seizure

of the firearms, *see United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006); and (2) the firearms

would have been inevitably discovered considering that the officers later obtained consent to search

the entire residence and the officers would have discovered the same during that search, *see Nix v.

Williams*, 467 U.S. 431 (1984).[24]

---

[21]

The Court notes that while Detective Steckel removed his taser and pointed it at the Defendant, he did so only after the Defendant stated that there were firearms under the bed.  (*See* Transcript at 30:1-12).  In other words, because the Defendant had previously consented to the search under the bed (through his words and actions), Detective Steckel's after-the-fact removal of his taser (presumably, for officer safety) could not have coerced or pressured Defendant into consenting to the same.

[22]

*See generally* Transcript at 28:24-29:25 (describing Defendant's movement towards him as "very odd" and describing Defendant's appearance as "noticeably more nervous than he had been," which placed Special Agent Haggerty on "high alert").

[23]

*See* Transcript at 30:25-31:3 ("Q: Was [the chair upon which the Defendant sat] in reach of the--of where the firearms supposedly were?  A: Yes.  I mean, with a lunge, yes.  He was probably five to seven feet, I would guess").

[24]

In the last sentence of his Post-Hearing Memorandum, Defendant cites three cases yet fails to explain his reliance on the same.  First, as to *United States v. Gonzalez*, 71 F.3d 819 (11th Cir.

D.    *Custody*

In his initial Motion but not in his Post-Hearing Memorandum, Defendant argues that any statements made by the Defendant either while in the unmarked Government vehicle or in the residence were obtained "in violation of his constitutional rights and without any valid waiver of his constitutional rights." (Defendant's Motion at ¶11.D). In response, the Government asserts that the Defendant was not in custody either in the vehicle or in the residence when the officers asked him if there were firearms under the bed and he responded in the affirmative, and thus *Miranda* warnings were not required. (Government's Motion at 11-16; Government's Post-Hearing Memorandum at 13-18).

The Supreme Court in *Miranda* established that a suspect must be given specific warnings of his Fifth Amendment rights prior to "custodial interrogation." *Miranda*, 384 U.S. at 444. The Court elaborated: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id. See Stansbury v. California*, 511 U.S. 318, 322 (1994) (providing that while a court must examine all of the circumstances surrounding the interrogation, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the

_____

1996), Defendant pinpoint cites to a passage providing that failure to object to a search does not amount to consent. *Id.* at 829-30 (citation omitted). However here, Defendant did not merely fail to object. His conduct demonstrated consent by walking to where the firearms were located, reaching for them, and informing the officers that firearms were under the bed. Second, Defendant generally cites two additional cases but the Court finds that the facts here significantly depart from those cases. *See United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990) (holding that suspect's partially opening the door to determine the identity of officers knocking on the door did not amount to consent to the officers' entry); *United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir. 1998) (finding that defendant's act of moving aside when police officer entered defendant's motel room did not amount to implied consent to search the room).

degree associated with a formal arrest") (citations and internal quotation omitted) (alteration in original).  The custody determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogation officers or the person being questioned." *Stansbury*, 511 U.S. at 323.  "The relevant inquiry is how a reasonable man in the suspect's position would have understood his situation" in terms of whether he was free to terminate the interrogation and leave. *Id.* at 324.  In determining whether a person is subject to custodial interrogation for purposes of *Miranda*, courts consider the following factors:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-360 (3d Cir. 2006) (citations omitted).  Nevertheless, "custodial interrogation" is not susceptible to an exact definition and the determination of whether statements are a result of such interrogations must be made on a case by case basis. *See Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir.1974).  The Court will consider whether the Defendant was in custody in the vehicle and in his residence, in turn.

First, as to the officers' encounter with the Defendant in the vehicle, the Court finds that the Defendant was not in custody and hence *Miranda* does not apply.  Before entering the vehicle, Special Agent Haggerty informed the Defendant that he was not under arrest and that he was free to leave.  (*See* Transcript at 17:15-18).  While the location of the interrogation in the officers' unmarked vehicle may balance in favor of a finding of custodial interrogation, Defendant's agreement to conduct the questioning in the officers' vehicle and request that they proceed to a more secluded location belies any finding of custodial interrogation.  *See United States v. Baswell*, 792

F.2d 755, 759 (8th Cir. 1986) (finding that circumstances did not amount to custodial interrogation where "after the agents informed [defendant] that he was under no obligation to talk to them, [defendant] suggested going somewhere more private in the agents' car, and he voluntarily entered the car"); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (finding that defendant was not in custody or otherwise deprived of his freedom of action in any significant way during a half-hour interview at a police station where defendant voluntarily came to police station in response to request by police officer, he was immediately informed that he was not under arrest, and he left police station after interview). Furthermore, there is no evidence that the officers displayed any coercive tactics. For example, the officers did not handcuff or otherwise restrain the Defendant. (*See* Transcript at 18:5-8).

Second, as to the officers' encounter with the Defendant in the residence, the Court again finds that the Defendant was not in custody and hence, *Miranda* does not apply. There is no evidence that the officers used any coercive tactics and, once again, the Defendant not only voluntarily submitted to the questioning but led the officers into his home, unlocked the door, and disabled the alarm, all on his own accord. "When a person is questioned on his own turf, ... the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Vongnarath*, Criminal No. 08-69, 2008 WL 2156359, at *2 (E.D. Pa. May 21, 2008) (quoting *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), *cited with approval in U.S. v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006)); *see also Beckwith v. United States*, 425 U.S. 341, 347 (1976) (finding that non-custodial interview by government agents in home of tax fraud suspect, as focus of investigation, "simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding"); *Government of Virgin*

*Islands v. Berne*, 412 F.2d 1055, 1059-1060 (3d Cir. 1969) ("But the mere presence of the police at the subject's home cannot be equated, per se, with the deprivation of significant freedom of action with which the Court in Miranda dealt").

Accordingly, the Court finds that there is no evidence in the record to suggest that the Defendant was in custody either while in the officers' vehicle or while in his residence. Hence, *Miranda* is not implicated here.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant's Motion to Suppress Physical Evidence and Statements [27].

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   June 6, 2008

cc:     All parties of record.